487 So.2d 398 (1986)
AETNA CASUALTY & SURETY CO., Appellant,
v.
MONSANTO COMPANY, Appellee,
v.
GREENVILLE PLASTICS, INC., Appellant/Appellee.
Nos. BG-58, BG-59.
District Court of Appeal of Florida, First District.
April 28, 1986.
*399 J. Craig Knox of Fuller & Johnson, Tallahassee, for appellant Aetna Cas. & Sur. Co.
Robert P. Gaines of Beggs & Lane, Pensacola, for appellee Monsanto Co.
Philip A. Bates of Emmanuel, Sheppard & Condon, Pensacola, for appellant/appellee Greenville Plastics, Inc.
WENTWORTH, Judge.
In these consolidated cases Greenville Plastics, Inc., defendant below, appeals a final judgment on a jury verdict awarding plaintiff Monsanto Company $290,000 for damages incurred in the use of plastic bobbin sleeves supplied by Greenville. Greenville's carrier Aetna Casualty & Surety Company also appeals to the extent of its joint and several liability for $161,000 of the award, and Aetna appeals the partial summary judgment for Greenville on its cross claim as to coverage controverted by Aetna under its general liability policy. We affirm on all issues: as to jury instructions and denial of directed verdict/judgment n.o.v., raised by Greenville and Aetna; and on the cross-claim coverage issues raised by Aetna.
Between 1977 and 1983 when suit was filed, Monsanto manufactured nylon yarn in Florida. The yarn was wound on a plastic sleeve fitted over a steel bobbin. The yarn, bobbin and sleeve unit then was shipped to textile producers who ran off the yarn at high speed onto their machines, and returned the sleeves to Monsanto for reuse. In its complaint filed in 1983 Monsanto alleged that bobbin sleeves purchased from Greenville did not meet contract specifications with respect to variance in depth of microgrooves, and as a result of "breach of warranty in the manufacture" *400 of the sleeves, Monsanto was required to pay damages to customers and labor costs for removing and replacing sleeves after excess yarn breakage occurred in 1981. Upon motions by Monsanto and Aetna the court entered partial summary judgment holding that Aetna's comprehensive general liability policy covered Greenville's liability for Monsanto's reimbursements to customers and expenses in winding yarn onto replacement sleeves, but did not cover any liability of Greenville for Monsanto's replacement or repair of sleeves.
On the coverage issues Aetna relies on policy exclusions identified as "injury to products",[1] "sistership",[2] and "business risk"[3] exclusions. In applying the first of these exclusions courts have recognized that the purpose of comprehensive liability insurance coverage is to provide protection for personal injury or property damage caused by a completed product, but not for the replacement and repair of that product. LaMarche v. Shelby Mutual Ins. Co., 390 So.2d 325 (Fla. 1980). Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A.2d 788 (1979), states the majority rule on the injury to product exclusion, holding that the exclusion precludes coverage for costs of correcting a product defect. Under Weedo, defects in products are "business risks" as opposed to insurable occurrences involving personal injury or property damage to others as a result of the insured's product. The majority rule, where a product has been incorporated into another product, is that the damage is considered damage to the larger entity, and the damage is deemed to have resulted from an insurable occurrence, as opposed to a business risk. Elco Industries Inc. v. Liberty Mutual Ins. Co., 46 Ill. App.3d 936, 5 Ill.Dec. 266, 361 N.E.2d 589 (1977), reversed after remand; 90 Ill. App.3d 1106, 46 Ill.Dec. 319, 414 N.E.2d 41 (1980). Aetna characterizes the segregating, de-sleeving and re-sleeving costs as repair and replacement costs, which are properly excludable. That view does not comport with the findings in Elco and other cases construing the exclusion, on consideration of which we affirm the trial court's view that the costs of replacing the sleeves were properly excluded but the costs of removing the defective parts were covered by the policy. Goodyear Rubber & Supply Co., Inc. v. Great American Ins. Co., 471 F.2d 1343 (9th Cir.1973).
We find no reported Florida cases construing the "sistership" exclusion. In other jurisdictions a distinction is made based on whether the insured's product could be withdrawn without physical injury to the product of a third party claiming damages. See cases collected in Elco Industries, supra. If the third party manufacturer's costs were greater than those necessary to replace the insured's defective products, and if the insured's defective product resulted in damage to other parts of the third party manufacturer's final product, the costs are not excludable under this provision. Here, Greenville's defective sleeves had to be segregated from other sleeves, taken off the yarn units, and other sleeves had to be placed on the bobbins. These costs were above and beyond the replacement costs for new sleeves. The jury awarded $135,000 to Monsanto for these costs, and $129,000 for replacement costs alone. Damage occurred to Monsanto's customers' yarn, which broke, causing *401 the weaving machines to be shut down, because of the defective sleeves. Those costs are accordingly not excluded.
As to the "loss of use" exclusion, that provision states that insurance does not apply to loss of use of tangible personal property which has not been physically injured, resulting from the failure of the insured's products to meet the level of quality warranted. Aetna claims this exclusion applies to the claims of Monsanto's customers for "down time" as a result of the yarn breaks. The exclusion does not apply because Monsanto's customers' property, i.e. yarn, was physically injured as a result of the defective sleeves.
Appellants' arguments on jury instructions[4] devolve into a primary contention that the court prevented jury consideration of their inspection/waiver/estoppel defenses. They contend the court committed reversible error in rejecting certain proffered instructions, because "there was evidence presented ... that Monsanto waived its right to demand compliance with the specifications for the bobbin sleeves after approving samples of the bobbin sleeves and continuing to order and use the bobbin sleeves without complaint for four years" after 1977. The rejected instruction which most explicitly framed appellants' defense was as follows:
I charge you that if you find from the evidence that the plaintiff Monsanto either inspected or could and should have inspected the bobbin sleeves and thereby discovered the allegedly defective sleeves before the sleeves were put into use and failed to do so and such failure was a legal cause of the plaintiff Monsanto's loss, the plaintiff Monsanto may then be said to have been estopped to recover against the defendants and you may so find for the defendant.
The broad alternative language of this instruction would permit the jury to deny recovery for contract violations if Monsanto failed to discover defective sleeves when it "could and should have inspected" the items before use. Absent such a condition in the contract, the authorities relied on by appellants do not support that instruction upon the evidence in this case. Rutig v. Lake Jem Land Company, 155 Fla. 420, 20 So.2d 497 (1945); Livingston v. Malever, 103 Fla. 200, 137 So. 113 (1931); Ferslew v. Relaford, 351 So.2d 368 (Fla. 1st DCA 1977); Rylander v. Sears, Roebuck & Co., 302 So.2d 478 (Fla. 3d DCA 1974); Pan American Distributing Company v. Sava-Stop, Inc., 124 So.2d 753 (Fla. 1st DCA 1960). Even assuming proper waiver instructions would have been in order, we find no error in the rejection of the request as submitted. As for the merits of this defense, Monsanto makes a convincing argument based upon evidence that Monsanto was never aware that the microgrooves were not deep enough until after the damages complained of had occurred and its investigation pinpointed this defect as the cause.
With respect to the denial of motion for directed verdict and for judgment non obstante veredicto on causation, we agree with the trial court's view of the evidence. Considered in a light most favorable to Monsanto as the non-moving party, there was testimony presented that Greenville's sleeve microgrooves were shallower than required by the specifications, and that shallow grooves caused entrapment of yarn. There was also evidence that other possible causes of yarn breaks had been investigated and excluded, from which the jury could conclude that it was more likely than not that the shallow microgrooves were a substantial factor in causing the breaks. Gooding v. University Hospital Building, Inc., 445 So.2d 1015 (Fla. 1984).
Affirmed.
BOOTH, C.J., and SMITH, J., concur.
NOTES
[1] "This insurance does not apply: ... (n) to property damage to the named insured's products arising out of such products or any part of such products."
[2] "This insurance does not apply ... (p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products ... or of any property of which such products ... form a part, if such products ... or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein." The term "sistership" is said to derive historically from government recall of all of a group of airplanes when one of such "sister" ships showed structural defects.
[3] "This insurance does not apply: ... (m) to loss of use of tangible property which has not been physically injured or destroyed resulting from ... (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured; ..."
[4] Some of the rejected instructions expressly referenced an implied warranty theory, contrary to the court's ruling, based apparently on Monsanto's pretrial statement, that this was "a case of contract" without implied warranty involvement. We note, in any event, that the jury found liability for breach of express warranty instructions. Tarwacki v. Royal Crown Bottling Co. of Tampa, Inc., 330 So.2d 253 (Fla. 2d DCA 1976).